NMA:NS
F. #2013R00786

**13 MISC 1035**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - --X

IN THE MATTER OF AN APPLICATION
OF THE UNITED STATES OF AMERICA
FOR ORDERS AUTHORIZING THE
DISCLOSURE OF LOCATION DATA
RELATING TO THREE SPECIFIED
WIRELESS TELEPHONES

**FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT OF
APPLICATION
(Fed. R. Crim. P. 41; T. 18, U.S.C.,
§§ 2703(c)(1)(A), 3103a and 3117;
T. 28, U.S.C., § 1651(a))

- - - - - - - - - - - - - --X
EASTERN DISTRICT OF NEW YORK, SS:

     I, JOSEPH CHIMIENTI, being first duly sworn, hereby depose and state as

follows:

     1.    I make this affidavit in support of an application for search warrants

under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information

about the location of (1) the cellular telephone assigned call number (571) 337-7018,

subscribed to by REDINEL DERVISHAJ, Dummy, Dummy, No City, New York 11102

("SUBJECT TELEPHONE 1"), whose wireless telephone service provider is T-Mobile;

(2) the cellular telephone assigned call number (347) 392-0246, subscribed to by BESNIK

LLAKATURA, 186 Jefferson Avenue, Staten Island, New York 10306 ("SUBJECT

TELEPHONE 2"), whose wireless service provider is Sprint; and (3) the cellular telephone

assigned call number (516) 423-1788, subscribed to by DENIS NIKOLLA, 161 Utica Avenue,

Apartment 2G, Brooklyn, New York 11213, whose wireless service provider is Sprint

1

("SUBJECT TELEPHONE 3") (collectively, the "SUBJECT TELEPHONES"). T-Mobile and Sprint are collectively referred to as the "Service Providers." The SUBJECT TELEPHONES are described herein and in Attachments A-1 and A-2 to the respective search warrants, and the location information to be seized is described herein and in Attachments B-1 and B-2 to the respective search warrants.

2.     I have been a Detective with the New York City Police Department for approximately 13 years and a Task Force Officer with the Federal Bureau of Investigation ("FBI") for approximately three years. I am currently assigned to FBI Squad C-42, where I investigate emerging organized crime groups, including Albanian organized crime enterprises, engaged in extortion, violent robberies, loansharking, and other offenses. These investigations are conducted both in an undercover and overt capacity. I have participated in investigations involving search warrants and arrest warrants. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Because the purpose of this affidavit is limited to demonstrating probable cause for the requested warrants, it does not set forth all of my knowledge about this matter. In addition, when I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.

2

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that extortion and conspiracy to commit extortion, in violation of 18 U.S.C. § 1951 have been committed, and are being committed, by REDINEL DERVISHAJ, BESNIK LLAKATURA, DENIS NIKOLLA and others known and unknown in the Eastern District of New York and elsewhere.   There is also probable cause to believe that REDINEL DERVISHAJ has used, and is currently using, SUBJECT TELEPHONE 1 to engage in and facilitate extortion and conspiracy to commit extortion, that BESNIK LLAKATURA has used, and is currently using, SUBJECT TELEPHONE 2 to engage in and facilitate extortion and conspiracy to commit extortion, and that DENIS NIKOLLA has used, and is currently using, SUBJECT TELEPHONE 3 to engage in and facilitate extortion and conspiracy to commit extortion.   There is therefore probable cause to believe that the location information, including but not limited to E-911 Phase II data (or other precise location information) concerning the SUBJECT TELEPHONES (the "REQUESTED INFORMATION"),[1] as described in Attachments B-1 and B-2, will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses, as well as victims of these offenses.

---

[1]     Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by the SUBJECT TELEPHONE at the start and end of any call or text message transmission.   In requesting cell site information, the government does not concede that such cell site records — routinely retained by wireless carriers as business records — may only be obtained via a warrant issued on probable cause. *See In re Application*, 632 F. Supp. 2d 202 (E.D.N.Y. 2008) (authorizing prospective acquisition of cell-site records under combined authority of 18 U.S.C. 2703(d) & 3121 *et seq.*); *In re Application*, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (same).

**PROBABLE CAUSE**

5.     The FBI has been investigating an extortion conspiracy involving

REDINEL DERVISHAJ, BESNIK LLAKATURA, DENIS NIKOLLA and others.   The

investigation began in May 2013 following receipt of information from John Doe #1, a victim

of the extortion conspiracy who reported threats made against him to law enforcement, and

whose identity is known to your affiant.   Following receipt of information from John Doe #1,

the FBI has used various investigative techniques to further the investigation, including (as

described below) the use of court-authorized wiretaps of the SUBJECT TELEPHONES.   The

investigation has revealed that DERVISHAJ, LLAKATURA and NIKOLLA use the

SUBJECT TELEPHONES to facilitate extortion activities involving John Doe #1 and other

extortion victims.[2]

6.     During the course of the investigation, the following orders pertaining to

the SUBJECT TELEPHONES have been obtained.   On July 11, 2013, the Honorable Ramon

E. Reyes, Jr., United States Magistrate Judge, signed an order authorizing a pen register and

trap and trace device on SUBJECT TELEPHONE 2 for a period of 60 days.   (13 MISC 529).

On July 12, 2013, the Honorable Ramon E. Reyes, Jr., United States Magistrate Judge, signed

an order authorizing a pen register and trap and trace device on SUBJECT TELEPHONE 1 for

a period of 60 days.   (13 MISC 532).   On July 16, 2013, the Honorable Cheryl M. Pollak,

United States Magistrate Judge, signed an order authorizing the release of historical cell-site

---

[2]     Because the purpose of this affidavit is to set forth only those facts necessary to
establish probable cause for the requested warrants, I have no described all of the relevant facts
and circumstances of which I am aware.

4

information for SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 for the period

from May 1, 2013 to July 16, 2013. (13 MISC 539).   On July 16, 2013, the Honorable Cheryl

M. Pollak, United States Magistrate Judge, signed an Order authorizing the disclosure of

location data for SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 for a period of 30

days.   (13 MISC 540).   On August 6, 2013, the Honorable Dora L. Irizarry, United States

District Judge for the Eastern District of New York, authorized the interception of wire and

electronic communications and the disclosure of geographic location information over

SUBJECT TELEPHONE 1 for a period of 30 days.   (13 MISC 0618 (DLI)).   Interceptions

pursuant to the August 6, 2013 Order ceased on September 5, 2013.   On August 21, 2013, the

Honorable Vera M. Scanlon, United States Magistrate Judge, signed an order authorizing pen

registers and trap and trace devices on, inter alia, SUBJECT TELEPHONE 3 for a period of 60

days.   (13 MISC 682).   On August 22, 2013, the Honorable Vera M. Scanlon, United States

Magistrate Judge, signed an order authorizing the disclosure of location data for, inter alia,

SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 for a period of 30 days.   (13

MISC 684).   On September 10, 2013, the Honorable Steven M. Gold, Chief United States

Magistrate Judge, signed an order authorizing the disclosure of location data for SUBJECT

TELEPHONE 1 for a period of 30 days.   (13 MISC 737).   On September 11, 2013, the

Honorable Steven M. Gold, Chief United States Magistrate Judge, signed an order authorizing

pen register and trap and trace devices on SUBJECT TELEPHONE 1 and SUBJECT

TELEPHONE 2 for a period of 60 days.   (13 MISC 740).   On September 16, 2013, the

Honorable Dora L. Irizarry, United States District Judge for the Eastern District of New York,

reauthorized the interception of wire and electronic communications and the disclosure of geographic location information over SUBJECT TELEPHONE 1, authorized the interception of wire and electronic communications and the disclosure of geographic location information over SUBJECT TELEPHONE 2, and authorized the interception of wire communications and the disclosure of geographic location information over SUBJECT TELEPHONE 3 for a period of 30 days.  (13 MISC 0618 (DLI)).  On October 17, 2013, the Honorable Dora L. Irizarry, United States District Judge, signed an order authorizing the disclosure of location data for, inter alia, the SUBJECT TELEPHONES, for a period of 30 days (13 MISC 866 (DLI)).  On October 21, 2013, the Honorable Viktor V. Pohorelsky, United States Magistrate Judge, signed an order authorizing a pen register and trap and trace device on SUBJECT TELEPHONE 3 for a period of 60 days.  (13 MISC 876).  On October 24, 2013, the Honorable Dora L. Irizarry, United States District Judge, reauthorized the interception of wire and electronic communications and the disclosure of geographic location information over SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 for a period of 30 days, and reauthorized the interception of wire communications and the disclosure of geographic location information over SUBJECT TELEPHONE 3 for a period of 30 days.  (13 MISC 0618 (DLI)).

       7.     Certain of the communications intercepted over the SUBJECT TELEPHONES pursuant to Court-authorized wiretaps, most of which were in Albanian, are summarized and described below.   All quotations and summaries of intercepted communications are based on line sheets and draft translations and summaries, not final

transcripts.   All dates and times set forth herein of these communications are approximate and based on the monitoring equipment at the time the calls and texts were intercepted.

EXTORTION OF JOHN DOE #1

      8.    John Doe #1 was raised in Albania and thereafter immigrated to the United States as an adult.   John Doe #1 owns a pizzeria in Little Neck, New York (hereinafter, the "Queens Pizzeria") and a seafood restaurant in Astoria, New York (hereinafter, the "Astoria Restaurant").   John Doe #1 has advised the following, in substance and in part:

      a.    On or about the afternoon of May 11, 2013, an employee of the Queens Pizzeria informed John Doe #1 that a man had entered the Queens Pizzeria and asked to speak with John Doe #1.   John Doe #1 subsequently entered the dining area of the Queens Pizzeria and spoke with the man, an Albanian male, who introduced himself as "Redi from Durrsi."   Durrsi is a city in Albania.   During their conversation, "Redi" stated that (1) John Doe #1 would have to pay him because John Doe #1 had recently opened the Astoria Restaurant in "our neighborhood;" (2) if John Doe #1 did not know who "Redi" was, John Doe #1 should look him up;[3] and (3) "Redi" was going to send two men to the Astoria Restaurant that evening and John Doe #1 needed "to take care of them."

---

[3]    A "Google" search for "Redinel Dervishaj" results in articles from various media outlets showing photographs of DERVISHAJ and revealing the following information regarding DERVISHAJ's involvement in a fatal stabbing: According to the news articles, in or about March 2012, DERVISHAJ was arrested for stabbing Antonio Lacertosa with a butcher knife on Staten Island, New York, during Lacertosa's engagement party.   Lacertosa died from his injuries.   In or about April 2012, a Staten Island grand jury declined to indict DERVISHAJ for Lacertosa's murder, after viewing video surveillance footage of events leading up to the stabbing, which DERVISHAJ's counsel argued showed DERVISHAJ acted in self-defense.

b.      Following this encounter, on or about May 11, 2013, John Doe #1 called SUBJECT TELEPHONE 2 and spoke with his friend, BESNIK LLAKATURA, a New York City Police Department ("NYPD") officer of Albanian descent.   LLAKATURA advised John Doe #1 that he know who "Redi" was, that "Redi" and others extort various Albanian establishments in Astoria and that John Doe #1 opened the Astoria Restaurant in "their neighborhood."

c.      John Doe #1 has known BESNIK LLAKATURA for many years and previously lived with LLAKATURA.   As a result, LLAKATURA knows personal details regarding John Doe #1, including John Doe #1's mobile telephone number and the fact that John Doe #1's brother-in-law lives in Massachusetts and owns a liquor store there.

d.      On or about the evening of May 11, 2013, an employee of the Astoria Restaurant informed John Doe #1 that two men came to the Astoria Restaurant looking for John Doe #1 when John Doe #1 was not there.   At approximately 10:41 p.m., John Doe #1 received a call on his mobile telephone from a telephone number with area code 718 (hereinafter, "718 Telephone Number 1").[4]   According to John Doe #1, the person who called him from 718 Telephone Number 1 identified himself as "Redinel" and, in Albanian, reiterated that John Doe #1 had opened his restaurant in "our neighborhood" and, as a result, John Doe #1 would have to pay "us."

---

[4]      Records checks reveal that 718 Telephone Number 1 belongs to a pay phone located in Astoria, New York.

e.     Prior to May 11, 2013, John Doe #1 had never met "Redi."   At no point during their May 11, 2013 encounter did John Doe #1 provide "Redi" with his mobile telephone number.

9.     During the course of the investigation, John Doe #1 identified a photograph of REDINEL DERVISHAJ as the individual who introduced himself to John Doe #1 as "Redi from Durrsi" on May 11, 2013.

10.     Video surveillance footage captured by security cameras installed within the Queens Pizzeria corroborates John Doe #1's account of what transpired on the afternoon of May 11, 2013.   The video surveillance footage shows a man entering the Queens Pizzeria at approximately 3:47 p.m.[5] and speaking with an employee behind the pizza counter.   The employee then walks away.   Approximately 25 seconds later, John Doe #1 enters the dining area from the back of the Queens Pizzeria and speaks with the man who had entered.   John Doe #1 and the man sit together at a table in the Queens Pizzeria for a short time, after which the man exits the Queens Pizzeria.   Telephone records also confirm that John Doe #1 called SUBJECT TELEPHONE 2 at approximately 3:53 p.m. on May 11, 2013.

11.     On or about March 23, 2013, DERVISHAJ was arrested in Queens, New York on a domestic violence charge.   According to the NYPD Domestic Incident Report, DERVISHAJ's phone number is SUBJECT TELEPHONE 1.   As noted above, SUBJECT

---

[5]     Analysis of the video surveillance footage from the Queens Pizzeria indicates that the time stamp from the footage is one hour behind the actual time (i.e., when the video footage indicates that it is 2:47 p.m., it is actually 3:47 p.m.).   Times set forth herein reflect the actual time.

TELEPHONE 1 is also subscribed to by REDINAL DERVISHAJ.   Telephone records reveal that SUBJECT TELEPHONE 2 was used to call SUBJECT TELEPHONE 1 at approximately 3:13 p.m. on May 11, 2013 – approximately 34 minutes <u>before</u> DERVISHAJ visited the Queens Pizzeria on May 11, 2013 and approximately 40 minutes <u>before</u> John Doe #1 called LLAKATURA to inform him of the extortion threats made by DERVISHAJ.   Telephone records also reveal that SUBJECT TELEPHONE 1 was used to call SUBJECT TELEPHONE 2 on May 11, 2013, after DERVISHAJ's visit to the Queens Pizzeria, at the following approximate times: 3:49 p.m., 5:58 p.m., 6:08 p.m., and 10:47 p.m.

12.    According to John Doe #1, on or about the evening of May 12, 2013, John Doe #1 closed the Queens Pizzeria, got into his vehicle and began driving home.   As John Doe #1 was driving, he noticed a white Chevy Malibu sedan (hereinafter, the "Chevy Malibu") following his vehicle.   Thereafter, John Doe #1 observed DERVISHAJ approach his vehicle and state the following, in Albanian, in substance and in part: "What happened? You think you're a tough guy?   You think you have balls of steel?   I want $4,000 for the restaurant per month."   DERVISHAJ further stated that John Doe #1's restaurant was going to be a "gold mine" and that John Doe #1 had to pay "us."   Later that night, John Doe #1 noticed the Chevy Malibu in the vicinity of the Astoria Restaurant.   During the course of the investigation, John Doe #1 reported the license plate number of the Chevy Malibu to law enforcement personnel.   Records checks reveal that the Chevy Malibu is registered to DERVISHAJ at an address in Queens, New York.

13.     Telephone records reveal that (1) SUBJECT TELEPHONE 1 was used to call SUBJECT TELEPHONE 2 at approximately 1:56 p.m. and 5:20 p.m. on May 12, 2013; and (2) SUBJECT TELEPHONE 2 was used to call SUBJECT TELEPHONE 1 at approximately 8:29 p.m. on May 12, 2013.

14.     According to John Doe #1, on or about May 13, 2013, John Doe #1 met with LLAKATURA, at LLAKATURA's suggestion, in Astoria, New York.   According to John Doe #1, during that meeting, LLAKATURA informed John Doe #1, in substance and in part, that (1) DERVISHAJ and his associates run Astoria and extort other businesses there; (2) DERVISHAJ and his associates knew about John Doe #1's family, including a family member who owned a liquor store in another state; (3) if John Doe #1 reported the extortionate threats he received to law enforcement, DERVISHAJ and his associates would physically harm John Doe #1; and (4) DERVISHAJ would pass by the Astoria Restaurant the next day.

15.     According to John Doe #1, on or about May 14, 2013, at approximately 8:30 p.m., John Doe #1 noticed the Chevy Malibu on the streets of Astoria, Queens.   At approximately 10:30 p.m., John Doe #1 saw DERVISHAJ park the Chevy Malibu across the street from the Astoria Restaurant and walk towards the Astoria Restaurant.   Thereafter, DERVISHAJ again demanded money from John Doe #1.   John Doe #1 told DERVISHAJ that he was not making any money from the Astoria Restaurant, as he had not yet received his liquor license.   DERVISHAJ nonetheless continued to demand payment, telling John Doe #1, in substance and in part, "you have to take care of us."   Telephone records reveal that SUBJECT TELEPHONE 1 was used to call SUBJECT TELEPHONE 2 at approximately 8:04

11

p.m., 8:22 p.m., and 11:02 p.m. on May 14, 2013.   Based on my training and experience, and the timing of these calls, I believe that DERVISHAJ called LLAKATURA to discuss the extortion of John Doe #1.

16.     Telephone records further reveal that between May 17, 2013 and July 3, 2013, SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2 were in contact approximately 29 times.

17.     John Doe #1 has advised that he did not receive extortionate threats following the May 14, 2013 incident described above until in or about July 2013.   More specifically, John Doe #1 has advised the following, in substance and in part:

a.     On or about the evening of July 6, 2013, John Doe #1 closed up the Queens Pizzeria.   As John Doe #1 exited the Queens Pizzeria and proceeded towards his vehicle, which was parked in a driveway behind the Queens Pizzeria, John Doe #1 noticed a black Dodge Charger vehicle (hereinafter, the "Dodge Charger") also parked on a side street behind the Queens Pizzeria.

b.     John Doe #1 pulled out of the driveway and turned left onto the street, at which point he noticed at least three men inside the Dodge Charger.   Thereafter, the Dodge Charger began following John Doe #1's vehicle.   John Doe #1 noticed that the Dodge Charger did not have a front license plate.

c.     John Doe #1, who was driving on a narrow residential street, subsequently attempted to make a U-turn in an effort to see the Dodge Charger's rear license plate.   As John Doe #1 did so, his vehicle ended up nose-to-nose with the Dodge Charger, at

which point John Doe #1 reversed his vehicle for approximately half a block and attempted to turn his vehicle around.   John Doe #1 was unable to turn his vehicle around, however, as his vehicle was too close to a street pole on the corner.   At this point, the driver of the Dodge Charger exited the Dodge Charger carrying a gun, ran towards John Doe #1's vehicle, and pointed his gun at John Doe #1, while yelling at John Doe #1.   John Doe #1 managed to escape the area and drove away.

      d.    John Doe #1 has identified a photograph of DENIS NIKOLLA as the driver of the Dodge Charger who pointed a gun at John Doe #1 on July 6, 2013.

      18.    Video surveillance footage in and around the Queens Pizzeria shows that John Doe #1 closed the Queens Pizzeria on July 6, 2013 at approximately 11:27 p.m.   Video surveillance footage also shows that a black Dodge Charger drove by the Queens Pizzeria at approximately 9:47 p.m., and was outside the front entrance of the Queens Pizzeria from approximately 10:00 p.m. to 10:10 p.m.   Within the next hour, the video surveillance footage further shows a black Dodge Charger drive by the Queens Pizzeria several times onto a side street.   The black Dodge Charger captured by the video surveillance footage had no front license plate.

      19.    Records checks reveal that a black Dodge Charger is registered to DENIS NIKOLLA in Florida.   A check of the NYPD's Real-Time Crime Center License Plate Reader database indicates that the Dodge Charger registered to NIKOLLA has been captured on license plate reader cameras in New York City multiple times in July 2013.

20.     According to John Doe #1, shortly after the above-described incident with the Dodge Charger, at approximately 12:23 a.m. on July 7, 2013, John Doe #1 received a phone call on his mobile telephone from DERVISHAJ, using a telephone number beginning with area code 718 (hereinafter, "718 Telephone Number 2").[6]  According to John Doe #1, DERVISHAJ informed John Doe #1,  in Albanian and in substance and in part, that DERVISHAJ had not forgotten about John Doe #1, that he knew what was going on and that John Doe #1 "got lucky this time."   Based on my participation in the investigation, and my training and experience, I believe that DERVISHAJ's statement that John Doe #1 "got lucky this time" was a reference to John Doe #1 having been able to escape unharmed, despite NIKOLLA's having pointed a gun at him.

21.     Telephone records indicate that (516) 423-3813 is a mobile telephone issued by Sprint and subscribed to by DENIS NIKOLLA at 161 Utica Avenue, Apartment 2G, Brooklyn, New York 11213 (hereinafter, the "NIKOLLA Cell Phone").   Telephone records further show that on July 6, 2013 – the date that NIKOLLA displayed a gun to John Doe #1 – the NIKOLLA Cell Phone was in contact with SUBJECT TELEPHONE 1 leading up to the gun incident at the following approximate times: 2:49 p.m., 2:50 p.m., 3:04 p.m., 6:24 p.m., 6:57 p.m., 7:31 p.m., and 8:36 p.m.   Telephone records also show that the NIKOLLA Cell Phone was in contact with SUBJECT TELEPHONE 1 following DERVISHAJ's 12:23 a.m. call with John Doe #1 on July 7, 2013 at the following approximate times: 3:56 a.m., 7:55 p.m.,

---

[6]     Telephone records reveal that 718 Telephone Number 2 belongs to a pay phone located in Astoria, New York, located approximately 0.6 miles from the Astoria Restaurant.

8:04 p.m., 8:25 p.m., 8:35 p.m., and 10:43 p.m.  Based on the timing of these calls, my

participation in the investigation, and my training and experience, I believe these calls related

to the gun incident.

22.    At approximately 6:33 p.m. on July 7, 2013, LLAKATURA sent John

Doe #1 a text message from SUBJECT TELEPHONE 2, which stated "U are in deep shit u

know.  I dont want ur problems to become mine."  Telephone records further reveal that (1)

SUBJECT TELEPHONE 1 was used to call SUBJECT TELEPHONE 2 at approximately 1:32

p.m., 3:12 p.m., 4:44 p.m., 4:51 p.m., 8:26 p.m., 9:05 p.m., and 10:01 p.m. on July 7, 2013; and

(2) SUBJECT TELEPHONE 2 was used to call SUBJECT TELEPHONE 1 at approximately

9:49 p.m. on July 7, 2013.

23.    On or about July 8, 2013, at approximately 9:46 p.m.,[7] John Doe #1

called LLAKATURA on SUBJECT TELEPHONE 2, which call was consensually recorded.[8]

A review of the recording reveals that, during this call, LLAKATURA asked John Doe #1

what happened.   John Doe #1 told LLAKATURA he did not know what to do and that "they"

showed up with weapons.  LLAKATURA asked John Doe #1 where he was and John Doe #1

indicated he was in New Jersey.  LLAKATURA advised John Doe #1 to stay in New Jersey

---

[7]    In a prior affidavit in support of an application for orders authorizing the disclosure of
location data relating to SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2, sworn to
by FBI Task Force Officer Joseph Chimienti on July 16, 2013 (hereinafter, the "July 16, 2013
Location Data Affidavit"), the start time of this call was mistakenly set forth as approximately
5:50 p.m.  The correct start time of the call is approximately 9:46 p.m.

[8]    All consensually recorded calls between John Doe #1 and LLAKATURA and
DERVISHAJ set forth in this affidavit were consensually recorded and verified using an FBI
system.

and not to come to New York until tomorrow.  LLAKATURA further advised John Doe #1 that he would be in Astoria tomorrow and would see what to do then.

24.     Telephone records reveal that SUBJECT TELEPHONE 1 was used to call SUBJECT TELEPHONE 2 at approximately 1:42 p.m., 2:15 p.m., and 5:59 p.m. on July 8, 2013.

25.     At approximately 1:08 a.m. on July 9, 2013, John Doe #1 received a text message on his mobile telephone from LLAKATURA, using SUBJECT TELEPHONE 2, which text message was viewed by law enforcement agents and which telephone records confirm was sent from SUBJECT TELEPHONE 2.   The text message advised John Doe #1 to tell the manager of the Astoria Restaurant to be careful tomorrow and not to be by himself. Based on my participation in the investigation, and my training and experience, I believe this text message was meant to convey to John Doe #1 that DERVISHAJ and his associates intended to physically harm the manager of the Astoria Restaurant.

26.     On or about July 9, 2013, at approximately 10:19 a.m., John Doe #1 received a text message on his mobile telephone from LLAKATURA, using SUBJECT TELEPHONE 2, asking John Doe #1 to meet him in Staten Island, New York.   This text message has been viewed by law enforcement agents and telephone records confirm the time and sender of the text message.   Thereafter, telephone records indicate that John Doe #1 spoke with LLAKATURA on SUBJECT TELEPHONE 2.   According to John Doe #1, during their conversation, LLAKATURA provided John Doe #1 with an address in Staten Island at which John Doe #1 could meet LLAKATURA and, further, that "they" had another "crew"

following John Doe #1 around and that they were "bad people." Based on my participation in the investigation, and my training and experience, I believe LLAKATURA used the term "crew" to refer to DERVISHAJ and others working with him and, further, was attempting to instill fear in John Doe #1 by (1) indicating that DERVISHAJ had additional associates following John Doe #1; and (2) referring to DERVISHAJ and his associates as "bad people," which I believe was meant to convey that they were capable of violence.

27. On or about the afternoon of July 9, 2013, John Doe #1 met with LLAKATURA in Staten Island, New York, which meeting was physically surveilled by law enforcement agents.[9] John Doe #1 advised that the following transpired at the meeting, in substance and in part:

a. LLAKATURA advised John Doe #1 that he was in a bad situation and that the individuals extorting John Doe #1 were bad people who could not be fought because they would hurt John Doe #1.

b. LLAKATURA further advised that, on or about July 8, 2013, DERVISHAJ came to LLAKATURA's residence with two friends, one of whom was an individual LLAKATURA knew as "Altin,"[10] to discuss the amount of money they wanted from John Doe #1. LLAKATURA stated that DERVISHAJ wanted three months' payment from John Doe #1, for the three months the Astoria Restaurant had been open, totaling

---

[9]    John Doe #1 was equipped with a recording device during this meeting, but the recording device malfunctioned and, as a result, the meeting was not recorded.

[10]    In the July 16, 2013 Location Data Affidavit, the name of this individual was mistakenly set forth as "Ardit."

$12,000, by July 11, 2013.   LLAKATURA told John Doe #1 that if John Doe #1 did not pay, John Doe #1 would be physically harmed.   LLAKATURA further stated that the individuals extorting John Doe #1 had intended to wound John Doe #1 by shooting him on the evening of July 6, 2013.

        c.     John Doe #1 told LLAKATURA that he could not come up with $12,000 by July 11, 2013, and would only be able to pay $4,000 by that date.   LLAKATURA stated that he would speak with "them" and get back to John Doe #1.

        28.     At approximately 7:48 p.m. on July 9, 2013, LLAKATURA sent a text message from SUBJECT TELEPHONE 2 to John Doe #1 stating "U have no problem do ur things," which text message was reviewed by law enforcement agents and which telephone records confirm was sent from SUBJECT TELEPHONE 2.   Based on my participation in the investigation, and my training and experience, I believe this text message was meant to convey to John Doe #1 that LLAKATURA had spoken with DERVISHAJ regarding John Doe #1's ability to make a payment (as LLAKATURA indicated he would at the conclusion of his July 9, 2013 meeting with John Doe #1) and that John Doe #1 and/or his employees would not be physically harmed that evening.

        29.     Telephone records indicate that, at approximately 10:41 p.m. on July 9, 2013, John Doe #1 received a telephone call on his mobile phone from SUBJECT TELEPHONE 2.   According to John Doe #1, during this phone call, LLAKATURA indicated that he was a few blocks away from the Astoria Restaurant and was going to pass by, which LLAKATURA thereafter did.   Video surveillance footage in and around the Astoria

Restaurant shows LLAKATURA arriving at the Astoria Restaurant at approximately 10:44 p.m. and thereafter speaking with John Doe #1 outside the Astoria Restaurant.   John Doe #1 related that the following transpired during his meeting with LLAKATURA, in substance and in part:

a.   LLAKATURA related that two Albanian men had come to see LLAKATURA and told LLAKATURA that they had been sent by DERVISHAJ.

b.   According to LLAKATURA, one of the Albanian men then called DERVISHAJ from his mobile telephone and handed the phone to LLAKATURA. LLAKATURA indicated that DERVISHAJ told LLAKATURA that John Doe #1 must pay DERVISHAJ $6,000 by July 11, 2013 and another $6,000 by August 15, 2013, otherwise DERVISHAJ would break John Doe #1's legs.   LLAKATURA offered to loan John Doe #1 $2,000 towards the $6,000 payment to DERVISHAJ due on July 11, 2013.

30.   Telephone records reveal that (1) SUBJECT TELEPHONE 1 was used to call SUBJECT TELEPHONE 2 at approximately 3:42 p.m., 3:53 p.m., 9:06 p.m., and 9:09 p.m. on July 9, 2013; and (2) SUBJECT TELEPHONE 2 was used to call SUBJECT TELEPHONE 1 at approximately 6:50 p.m., 8:32 p.m., 8:59 p.m., 9:00 p.m., and 11:39 p.m. on July 9, 2013.

31.   On or about July 10, 2013 at approximately 6:08 p.m.,[11] John Doe #1 called LLAKATURA on SUBJECT TELEPHONE 2, which call was consensually recorded.

---

[11]   In the July 16, 2013 Location Data Affidavit, the start time of this call was mistakenly set forth as approximately 2:14 p.m. The correct start time of the call is approximately 6:08 p.m.

A review of the recording reveals that, during this phone call, LLAKATURA asked John Doe #1 whether John Doe #1 would make the cash payment to DERVISHAJ himself or whether LLAKATURA should do so instead.   John Doe #1 stated that he wanted to meet DERVISHAJ face-to-face.   LLAKATURA stated that he also wanted to be present at the meeting with DERVISHAJ and advised John Doe #1 to meet LLAKATURA the next day in the afternoon.

32.     At approximately 7:11 p.m.[12] on July 10, 2013, John Doe #1 called SUBJECT TELEPHONE 2 and spoke with LLAKATURA, which call was consensually recorded.   A review of the recording reveals that, during the phone call, LLAKATURA and John Doe #1 discussed whether to meet with DERVISHAJ later that night or the next day. LLAKATURA told John Doe #1 that he would provide him with a $2,000 loan when they met, but that John Doe #1 would need to provide the rest of the money ($4,000).   LLAKATURA and John Doe #1 ultimately agreed to meet the next day after LLAKATURA got off from work, in Astoria, New York.

33.     Telephone records reveal that (1) SUBJECT TELEPHONE 1 was used to call SUBJECT TELEPHONE 2 at approximately 4:57 p.m., 5:02 p.m., 5:05 p.m., and 7:32 p.m. on July 10, 2013; and (2) SUBJECT TELEPHONE 2 was used to call SUBJECT TELEPHONE 1 at approximately 5:54 p.m. and 6:15 p.m.[13] on July 10, 2013.

---

[12]     In the July 16, 2013 Location Data Affidavit, the start time of this call was mistakenly set forth as approximately 3:23 p.m. The correct start time of the call is approximately 7:11 p.m.

[13]     In the July 16, 2013 Location Data Affidavit, the end time of this call (6:20 p.m.) was

34. On or about July 11, 2013 at approximately 11:33 a.m.,[14] John Doe #1 called SUBJECT TELEPHONE 2 and spoke with LLAKATURA, which call was consensually recorded. A review of the recording reveals that, during the call, John Doe #1 expressed concern over his safety and asked LLAKATURA if he could meet with LLAKATURA. LLAKATURA told John Doe #1 that they could meet later in the day, five minutes before the meeting with DERVISHAJ, to go over any concerns John Doe #1 had. LLAKATURA stated that he would make sure nothing happened to John Doe #1 during the meeting with DERVISHAJ. LLAKATURA ultimately agreed to meet with John Doe #1 briefly in Staten Island, New York.

35. On or about the afternoon of July 11, 2013, John Doe #1 met with LLAKATURA in Staten Island, New York, which meeting was consensually recorded. John Doe #1 advised that the following transpired during the meeting, in substance and in part:

a. LLAKATURA told John Doe #1 that John Doe #1 could open up a club with DERVISHAJ. LLAKATURA advised that the club would be in John Doe #1's name, but DERVISHAJ would be a partner in the club. In the event this transpired, LLAKATURA told John Doe #1 that for every $2,000 John Doe #1 made from the club, John Doe #1 would have to give DERVISHAJ $1,000.

---

inadvertently listed as the start time of the call. The correct start time of the call is 6:15 p.m.

[14] In the July 16, 2013 Location Data Affidavit, the start time of this call is mistakenly set forth as approximately 7:37 a.m. The correct start time of the call is approximately 11:33 a.m.

       b.      LLAKATURA stated that he had spoken with DERVISHAJ and that, as long as John Doe #1 paid DERVISHAJ, John Doe #1 would be fine.

       c.      LLAKATURA stated that DERVISHAJ would search John Doe #1 when they met with DERVISHAJ later that night and that DERVISHAJ expected another $6,000 payment by August 15, 2013.

       d.      While discussing possible options with John Doe #1, LLAKATURA told John Doe #1 that if he went into witness protection, DERVISHAJ and his associates would hurt members of John Doe #1's family who reside in another state, and asked John Doe #1 what type of car John Doe #1's brother-in-law has.

       36.     A review of the recording of John Doe #1's meeting with LLAKATURA on the afternoon of July 11, 2013 corroborates John Doe #1's account of what transpired. In addition, the recording reveals that, during the meeting, LLAKATURA told John Doe #1 that DERVISHAJ would not call John Doe #1 because DERVISHAJ is worried that John Doe #1 might have the police involved. LLAKATURA further indicated that he told DERVISHAJ to search John Doe #1 when they meet.

       37.     On or about the evening of July 11, 2013, John Doe #1 met with LLAKATURA in Astoria, New York, which meeting was physically surveilled and partially consensually recorded. According to the physical surveillance, John Doe #1 entered LLAKATURA's vehicle at approximately 6:03 p.m. John Doe #1 advised that the following transpired during the meeting, in substance and in part:

     a.     John Doe #1 entered LLAKATURA's vehicle, at which point LLAKATURA handed John Doe #1 $2,000 in cash. LLAKATURA subsequently received a telephone call on his mobile phone from DERVISHAJ, during which John Doe #1 overheard DERVISHAJ telling LLAKATURA where to meet him. Following this phone call, LLAKATURA and John Doe #1 proceeded to meet with DERVISHAJ in Astoria, New York on an isolated street corner.[15] John Doe #1 was told to take everything out of his pockets and leave these items in LLAKATURA's vehicle.

     b.     At the start of the meeting with DERVISHAJ, DERVISHAJ searched both John Doe #1 and LLAKATURA. DERVISHAJ then asked John Doe #1 what he had to say for himself. LLAKATURA told John Doe #1 to give DERVISHAJ the money, at which point DERVISHAJ gestured to slow down and asked John Doe #1 to get into DERVISHAJ's car – the Chevy Malibu – with DERVISHAJ. LLAKATURA remained outside the Chevy Malibu.

     c.     While inside the Chevy Malibu, DERVISHAJ told John Doe #1 that he was lucky the other night and that John Doe #1 and the manager of the Astoria Restaurant should thank LLAKATURA. John Doe #1 then handed DERVISHAJ $6,000 in

---

[15]    A review of the recording corroborates John Doe #1's account of what transpired. The recording captures DERVISHAJ's voice telling LLAKATURA where they should meet. In addition, telephone records indicate that SUBJECT TELEPHONE 2 received an incoming call from SUBJECT TELEPHONE 1 at approximately 6:07 p.m. on July 11, 2013.

cash,[16] at which point DERVISHAJ inquired about the rest of the money.   John Doe #1

indicated that he was told he had until August 15, 2013 to come up with the rest of the money.

        d.     DERVISHAJ stated that, in the future, he would give John Doe

#1 his telephone number, which John Doe #1 could use to contact DERVISHAJ, in the event

John Doe #1 needed protection and also to make payments to DERVISHAJ.   John Doe #1

then left the meeting location with LLAKATURA.

        38.    On or about August 12, 2013, at approximately 5:06 p.m., John Doe #1

called SUBJECT TELEPHONE 2, which call was consensually recorded.   A review of the

recording reveals that, during the call, John Doe #1 informed LLAKATURA that

DERVISHAJ had not given John Doe #1 his phone number yet and that he was worried that

DERVISHAJ would come by unannounced seeking payment and John Doe #1 would "have

nothing."   John Doe #1 further asked LLAKATURA if he had seen DERVISHAJ around.   In

response, LLAKATURA implied that he had not seen or spoken with DERVISHAJ in a week,

stating, in sum and substance, "It's been a week since I have been to Astoria."   With respect to

DERVISHAJ not having given John Doe #1 his number, LLAKATURA responded, in sum

and substance, "So what?   Why do you give a fuck?   So he comes on the 16th, 17th, or the

20th, why do you give a fuck?"   LLAKATURA further stated, in sum and substance, "I don't

want to call him, man.   Not only that, but they change their numbers the same way they

change their whores.   [UI]   If I go today to Astoria and happen to see anyone, okay.   If I

---

16     The government provided John Doe #1 with $4,000 in cash to provide to DERVISHAJ
in advance of the July 11, 2013 meeting.

don't see [UI] whenever.  You should not give a fuck.  That's right.  If he wants to.  If he doesn't want to, fuck him.  Okay?"

39.    A few minutes thereafter on the same day, at approximately 5:12 p.m., DERVISHAJ received an incoming call on SUBJECT TELEPHONE 1 (Session 471) from (917) 500-5727, a mobile telephone used by LLAKATURA and subscribed to by "TAPAS SINY" at 661 Bay St., Staten Island, New York 10304-3828.  An establishment called Tapas Restaurant and Bar is located at 661 Bay Street in Staten Island and is owned by a corporation of which LLAKATURA's father is a principal.  During the phone call, LLAKATURA[17] appears to speak in code, referring to John Doe #1 as a woman who is asking whether she needs to give DERVISHAJ a Valentine's Day gift the day after Valentine's day (i.e., the 15th), to inform DERVISHAJ of the phone call he received from John Doe #1 just moments earlier:

BL:    I am taking care of your problems now too, fucking shit!

RD:    Why, brother?

BL:    You want to fuck her and you—

RD:    Hey uh, I am not alone here.

BL:    Oh, I am sorry.  And you don't give your phone number.

RD:    Why?  Were there problems?

BL:    No, there have not been any.  But said, "Will I give a gift for Valentine's Day or not?  Or what?

RD:    I will give it this time when we meet.  I will give the number too.

BL:    Hey don't . . . Valentine's is on February 14th.  [She] said she will not celebrate it on the 15th because she said the problem is that . . . I am sorry, who is listening there?  Maybe will not give it at all.

---

[17]    LLAKATURA has been identified as the user of (917) 500-5727 by recognition of his voice by comparison with other known recordings of LLAKATURA.

RD: [Laughs]

BL: [Laughs]

RD: Oh, he wants to on the 14th?

BL: Oh I don't know.   Now you . . . She wants you and now you're like this and that.

RD: Huh.

BL: I have my own problems with my own stuff.   Now I have to take care of problems.

RD: [Laughs]

BL: You're giving me a headache.   Even the little gray hair I have left will fall off.

RD: Yes, yes.

BL: Hey pretend you pass by, not today cause it will look bad, [UI] tomorrow.

RD: Tomorrow?

BL: And leave a number so that whenever she feels like making love to you—

RD: Yes.

BL: Do you understand?

40.     According to John Doe #1, on or about August 14, 2013, at approximately 3:45 p.m., John Doe #1 received a telephone call from DERVISHAJ, calling from phone number (646) 894-7578.   According to John Doe #1, DERVISHAJ provided him with (646) 894-7578 as his phone number (hereinafter, the "646 DERVISHAJ Number").

41.     On August 16, 2013, at approximately 4:18 p.m., John Doe #1 called the 646 DERVISHAJ Number, which call was consensually recorded.   A review of the recording reveals that, during the call, John Doe #1 asked DERVISHAJ if he would come to the Queens Pizzeria to receive an extortion payment from John Doe #1.   DERVISHAJ stated he was in

26

New Jersey, but would call John Doe #1 when he was back in New York.  At approximately 7:04 p.m., John Doe #1 called the 646 DERVISHAJ Number again, which call was consensually recorded.  A review of the consensual recording reveals that, during the call, DERVISHAJ indicated he had returned from New Jersey and would go meet John Doe #1 at the Queens Pizzeria.  Thereafter, an FBI surveillance team followed DERVISHAJ as he drove from his residence in Queens to the Queens Pizzeria.  According to the surveillance team, DERVISHAJ drove past the Queens Pizzeria, but did not exit his vehicle and enter the pizzeria.

        42.   At approximately 8:14 p.m. the same evening, DERVISHAJ placed an outgoing call on SUBJECT TELEPHONE 1 (Session 563) to SUBJECT TELEPHONE 2. During the call, DERVISHAJ appears to advise LLAKATURA that he has turned off his "other phone" because his meeting with John Doe #1 may be a "set-up."

    RD:   I closed the other phone.

    BL:   Who?

    RD:   Me, me.

    BL:   Why?

    RD:   Eh, it's set up.  Okay?  We'll meet.  Bye.

Based on my training, experience and participation in the investigation, I believe (1) the "other phone" is the 646 DERVISHAJ Number and (2) the term "set-up" is an indication that DERVISHAJ suspected his vehicle was being followed by law enforcement agents.

        43.   At approximately 9:02 p.m. that evening, DERVISHAJ received an incoming call on SUBJECT TELEPHONE 1 (Session 566) from SUBJECT TELEPHONE 2. During the call, LLAKATURA asked DERVISHAJ where he was.  DERVISHAJ stated that

he had just stopped at "the plaza" on 29th Street and 30th Avenue for coffee with his girlfriend. LLAKATURA stated that he was on his way and asked if he could meet DERVISHAJ in five minutes.   DERVISHAJ agreed.

44.   At approximately 9:07 p.m. that evening, John Doe #1 called the 646 DERVISHAJ Number, which call was consensually recorded.   The call went to voicemail. A review of the consensual recording reveals that John Doe #1 left DERVISHAJ a message asking DERVISHAJ whether he was coming and indicating that DERVISHAJ should call him, as he would be leaving the Queens Pizzeria.   At 9:15 p.m., DERVISHAJ received an incoming call on SUBJECT TELEPHONE 1 (Session 567) from SUBJECT TELEPHONE 2. During the call, LLAKATURA and DERVISHAJ advised each other where to meet.

45.   At 9:17 p.m., DERVISHAJ placed an outgoing call on SUBJECT TELEPHONE 1 (Session 568) to SUBJECT TELEPHONE 2.   During the call, DERVISHAJ apologized for making LLAKATURA wait and the two again arranged to meet without others present:

RD:   You will wait five minutes.   Huh?   I am sorry to make you wait.

BL:   Oh, okay.

RD:   My girlfriend went somewhere and I have no one who can stay at the table.

BL:   Uh-huh.

RD:   I will be there.   Sorry to make you wait, huh?

BL:   Oh yeah, oh.   Are you alone at the table?

RD:   Yeah, now I am alone at the table.   She went to get her friend.   As soon as we sat down, she called her.

BL:   So she went to get her there?

RD:   Eh.

BL:   You meet me here in the corner.   What's the problem?

RD:   Which corner?

BL:   Here, I am close by.

RD:   Where are you?   I don't see you.

BL:   At the end of the street.

RD:   Where at the end of the street?

BL:   [UI] plaza, yeah, yeah behind.   Turn around.   Eh, yeah.

RD:   Oh there.

Given what transpired during this call, along with my training, experience and participation in the investigation, I believe that DERVISHAJ and LLAKATURA met briefly at the end of the call and discussed John Doe #1 and DERVISHAJ's suspicion that he was being followed by law enforcement.

46.   Several minutes later, at approximately 9:25 p.m., John Doe #1 called SUBJECT TELEPHONE 2, which call was consensually recorded.   The call went to voicemail.   A review of the consensual recording reveals that John Doe #1 left LLAKATURA a message asking LLAKATURA to call him.   At approximately 9:30 p.m., John Doe #1 received a call from SUBJECT TELEPHONE 2.   According to John Doe #1, during the call, John Doe #1 told LLAKATURA, in sum and substance, that DERVISHAJ was supposed to pick up the extortion payment, but now was not answering his phone and John Doe #1 did not know what to do.   LLAKATURA asked John Doe #1 where he was and

whether he would come to Astoria.  John Doe #1 indicated he would come to Astoria after

work.  LLAKATURA asked John Doe #1 to call him when he was in Astoria.

47.     Approximately half an hour later, at 9:59 p.m., DERVISHAJ received an

incoming call on SUBJECT TELEPHONE 1 (Session 569) from SUBJECT TELEPHONE 2.

During the call, LLAKATURA appears to inform DERVISHAJ, in coded language, about his

9:30 p.m. call with John Doe #1, described above:

BL:    That bitch called me.

RD:    Uh-huh.

BL:    You know for what.

RD:    Yes.

BL:    Said why, meaning "why she doesn't want to go out with me?"  Do you
       understand?  For that—

RD:    Uh-huh.

BL:    I said if there was anything, I will meet you instead of him.

RD:    Uh-huh.   What did he say?

BL:    Yeah.

RD:    He said okay?

BL:    Yeah.

RD:    Okay, okay.

BL:    Okay.  If there is anything then.   Just look, you know how—

RD:    Yeah, yeah.

BL:    Okay?

RD:    I'll check things myself.

BL:    Okay.  Look, if she has information that she is being followed, good
       bye—

RD:    Uh-huh.

30

BL:   Do it like I told you and tell me right away.

RD:   Okay.

BL:   Okay?  Slowly.

Based on my training, experience and participation in the investigation, I believe (1) LLAKATURA's use of the term "that bitch" is a reference to John Doe #1; (2) LLAKATURA told DERVISHAJ on this call that he had suggested to John Doe #1 that John Doe #1 could meet with LLAKATURA, instead of DERVISHAJ to make the extortion payment and John Doe #1 was amenable to that arrangement; and (3) at the end of the call, LLAKATURA advised DERVISHAJ to take precautions regarding possible law enforcement surveillance.

      48.    Half an hour later, at approximately 10:28 p.m., John Doe #1 received three text messages sent from SUBJECT TELEPHONE 2 indicating that John Doe #1 should meet LLAKATURA at a street corner in Astoria, New York.  At approximately 10:42 p.m., John Doe #1 called SUBJECT TELEPHONE 2, which call was consensually recorded.  A review of the recording reveals that, during the call, John Doe #1 expressed frustration that DERVISHAJ did not come to the Queens Pizzeria and asked LLAKATURA what was going on:

JD#1:  I am still at the pizzeria.

BL:    Uh-huh.

JD#1:  [UI]   What, what, what is going on with [UI]?

BL:    Huh?

JD#1:  What is going to happen with him?   I don't get what's going on.

BL:    Come here.   Come and meet with me.   I told you.

JD#1:  I am throwing up and stuff, fucking shit.

BL:    Who?

JD#1:   They're giving me a heart attack *man*.   I don't know what is going to happen.

BL:   Come, come.

JD#1:   Huh?

BL:   I am saying come meet me here.

JD#1:   What's going to happen?   I don't know what's going to happen with this.

BL:   I am telling you to come and meet with me.   Do you hear me?   Don't talk on the phone.

JD#1:   Uh-huh.

BL:   *Okay?*[18]

JD#1:   [UI]

BL:   *Alright, bye.*

49.     At approximately 10:51 p.m., John Doe #1 received two text messages from SUBJECT TELEPHONE 2, stating "hello" and "just come."   John Doe #1 called SUBJECT TELEPHONE 2 at approximately 10:51 p.m., which call was consensually recorded.   The call went to voicemail.   A review of the recording reveals that John Doe #1 left a message indicating he was not going to meet LLAKATURA that evening as he was not feeling well, but they could meet "some other day."   At approximately 11:14 p.m., John Doe #1 received a phone call from SUBJECT TELEPHONE 2, which he did not answer.   At approximately 11:40 p.m., John Doe #1 called SUBJECT TELEPHONE 2, which call was consensually recorded.   A review of the recording reveals that, during the call, LLAKATURA made it appear as though he had not been in contact with DERVISHAJ that evening and was not involved in DERVISHAJ's extortion activities.   He further feigned concern for John Doe #1:

---

[18]     Words in italics were said in English.

BL:     What has happened *man*?

JD#1:  What?   Nothing has happened.   Do I know what happens at 12 midnight?

BL:     Who?

JD#1:  What?   For what should I come there at 12 midnight?   [overlap]  He was supposed to, he was supposed to come and meet me but did not come.   He doesn't pick up the phone or anything.

BL:     I don't know *man* what's up.   I thought that there was something going on with you.

JD#1:  There is nothing going on with me.   I am okay.   But because of that—

BL:     I told you, you should not give a fuck.   When it happens—  Why do you worry?   You're a moron.   I thought that maybe something happened to you and that's why I told you to come.

JD#1:  *No man*, nothing has happened to me.   But I waited—

BL:     Why do you give a fuck?

JD#1:  —I waited for the motherfucker and that—   I've been carrying all that money with me for that motherfucker.

BL:     Go home man, fuck it.   Go relax at home.   You should not give a fuck.   And that's it.

JD#1:  Uh-huh.

BL:     I thought you called because something happened *man*.

JD#1:  *No man*, nothing has happened.   Because of that, because he did not come and—my leg is a mess *fucking* I had surgery on it three days ago.   And that motherfucker "I will come, I will come" and I don't understand what's happening.

BL:     And you give a fuck!   You're a moron.   You talked about it once and now you should not give a shit.   If he wants, if not, all of them can fuck themselves.

JD#1:  Uh-huh.

BL:     I thought— Fucking shit.   I thought there was something wrong and that's why I said come.   That's why.

JD#1:  No, it's nothing like that, no.

Based on my training, experience and participation in the investigation, I believe that LLAKATURA began the conversation by inquiring why John Doe #1 was unwilling to meet with LLAKATURA that evening and, throughout the conversation, pretended he only wanted to meet with John Doe #1 out of concern that something bad had happened to John Doe #1 in relation to John Doe #1's scheduled extortion payment to DERVISHAJ.

      50.    On August 17, 2013, at approximately 12:20 p.m., DERVISHAJ placed an outgoing call on SUBJECT TELEPHONE 1 (Session 570) to SUBJECT TELEPHONE 2. During the call, LLAKATURA appears to update DERVISHAJ regarding his last phone conversation the night before with John Doe #1, described above in paragraph 49:

RD:    Anything new?

BL:    Nothing really, the same.  He told me, "I'm waiting, waiting.  What's next?  Yes, no, or what—"

RD:    Uh-huh.

BL:    "if he wants or what he does not want, or what," you know?  That's how we left it.

RD:    Uh-huh.  Are you going to be long?

BL:    Not sure.  Why?

RD:    If we could meet.

BL:    Okay, when I come back.

Based on my training, experience and participation in the investigation, I believe that during this call LLAKATURA informed DERVISHAJ that John Doe #1 was anxious to know whether or not DERVISHAJ would pick up the extortion payment and that DERVISHAJ and LLAKATURA agreed to meet later to discuss the situation.

      51.    Thereafter, on August 17, 2013, at approximately 4:45 p.m. and 5:13 p.m., John Doe #1 received two calls from the 646 DERVISHAJ Number, which John Doe #1

did not answer.   At 6:04 p.m., DERVISHAJ received an incoming call on SUBJECT TELEPHONE 1 (Session 591) from SUBJECT TELEPHONE 2.   During the call, DERVISHAJ appears to complain to LLAKATURA that John Doe #1 is not answering his phone calls:

RD:   I called him, I called him twice.   He doesn't pick up the phone.

BL:   Uh-huh, okay.

RD:   I don't like it at all.

BL:   Huh?

RD:   I don't like it that he is not picking up the phone.

BL:   [UI] the friend [UI].

RD:   Your friend?

BL:   Yeah.

RD:   Huh.

BL:   Because it's the last [UI].

RD:   But why, brother?

BL:   For no reason.   He owes you.   He is afraid because he owes money and that's it.

RD:   Okay then.

BL:   Okay?

RD:   Okay then, we'll talk.

BL:   Bye.

RD:   Call me for everything.

52.   Thereafter, John Doe #1 received four more incoming calls from the 646 DERVISHAJ Number at the following approximate times on August 17, 2013: 7:59 p.m., 8:03 p.m., 9:15 p.m., and 9:28 p.m.   John Doe #1 did not answer any of these calls.

53.    On August 18, 2013, at approximately 11:51 a.m., John Doe #1 received

an incoming call from the 646 DERVISHAJ Number, which he did not answer.    At

approximately 12:27 p.m., John Doe #1 called the 646 DERVISHAJ Number, which call was

consensually recorded.    A review of the recording reveals that, during the call, DERVISHAJ

complained that John Doe #1's phone did not work:

> RD:    Your phone doesn't work?
>
> JD#1: But I have also not been feeling well.  I have been throwing up and
> stuff.
>
> RD:    *Okay.*
>
> JD#1: What are you doing?
>
> RD:    Not much.
>
> JD#1: I waited for you on Friday *man.*
>
> RD:    Huh?
>
> JD#1: I am saying that I waited for you on Friday.   You did not come.
>
> RD:    *Yeah* I did not come because I was busy.
>
> JD#1: Uh-huh.   When will you come now?
>
> RD:    Huh?
>
> JD#1: I am saying, when will you come?
>
> RD:    When will I come now?   God willing when I have time I will come and
> meet you, *okay*?
>
> JD#1: *Alright.*   I come back tomorrow, if so—
>
> RD:    Okay, good.   God willing.
>
> JD#1: Good night then.   Ciao.

Based on my training, experience and participation in the investigation, I believe that during

this call, John Doe #1 asked DERVISHAJ why he did not show up to receive the $6,000

extortion payment from John Doe #1 on Friday, August 16, 2013 and DERVISHAJ lied to John Doe #1 when he indicated that he was simply "busy."

54. Thereafter, at approximately 12:46 p.m. on August 18, 2013, DERVISHAJ placed an outgoing call on SUBJECT TELEPHONE 1 (Session 600) to SUBJECT TELEPHONE 2. During the brief call, DERVISHAJ and LLAKATURA indicated that they would speak on another phone. Based on my training, experience and participation in the investigation, I believe DERVISHAJ subsequently spoke to LLAKATURA using an unmonitored telephone to update LLAKATURA on his phone call with John Doe #1.

55. On or about August 20, 2013 at approximately 9:40 p.m., John Doe #1 met with LLAKATURA in Astoria, New York to make an extortion payment, which meeting was consensually recorded. A review of the recording reveals that at the beginning of the meeting, LLAKATURA asked John Doe #1 whether he had his phone with him. John Doe #1 stated that he left his phone in his car. LLAKATURA then stated "come here, open your arms," at which point, according to John Doe #1, LLAKATURA patted John Doe #1 down. The recording further reveals that, during the meeting, LLAKATURA told John Doe #1, in sum, substance and in part, that (1) DERVISHAJ told LLAKATURA that the night DERVISHAJ was supposed to meet John Doe #1 at the pizzeria, DERVISHAJ was followed by "two FBI cars;" (2) DERVISHAJ suspected he was followed because of John Doe #1; and (3) LLAKATURA explained to DERVISHAJ that John Doe #1 would not go to law enforcement because John Doe #1 has family in the United States and Albania. LLAKATURA further warned John Doe #1 that "they are motherfuckers" and that "if something happens to him [DERVISHAJ], fuck it, they are animals." LLAKATURA also reported that DERVISHAJ said "he will not go to jail" and that John Doe #1 should know that DERVISHAJ will not "just let it go" if something happens to DERVISHAJ. After John Doe

#1 denied any involvement with law enforcement, LLAKATURA offered to accept John Doe #1's extortion payments going forward if John Doe #1 was afraid to pay DERVISHAJ himself. During the meeting, LLAKATURA accepted a $6,000 payment from John Doe #1[19] and told John Doe #1 that he would not have any problems with DERVISHAJ since he was making payments. Throughout the conversation, LLAKATURA expressed concern about getting involved with DERVISHAJ, indicating that he could lose his job or end up in jail by receiving phone calls from DERVISHAJ.

56. Based on my training, experience and participation in the investigation, I believe LLAKATURA used this conversation to convey threats of violence to John Doe #1 and his family if John Doe #1 reported the extortion to law enforcement, while at the same time attempting to appear as though he was only involved in the extortion to help John Doe #1, at great personal risk to himself.

57. On September 16, 2013, at approximately 9:17 p.m., video surveillance from the pole camera installed outside of the Queens Pizzeria captured NIKOLLA entering the Queens Pizzeria. According to John Doe #1, after entering the Queens Pizzeria, NIKOLLA, in sum and substance, asked John Doe #1 for another payment and John Doe #1 told NIKOLLA that he would have the money in two days, namely, on September 18, 2013. NIKOLLA then told John Doe #1 that he needed to make a call. Video surveillance from the pole camera captured NIKOLLA leaving the Queens Pizzeria. Moments later, SUBJECT TELEPHONE 1 received an incoming call from 917-391-3326, a telephone that I believe is used by NIKOLLA (the "NIKOLLA 917 TELEPHONE").[20] After the call was placed, NIKOLLA went back into John Doe #1's restaurant. Video surveillance footage from

---

[19] The government provided John Doe #1 with $6,000 in cash to provide to LLAKATURA in advance of the August 20, 2013 meeting.

[20] Because interception pursuant to the Honorable Dora L. Irizarry's September 16, 2013 order had not yet begun, no conversations on the SUBJECT TELEPHONES were recorded.

cameras inside the Queens Pizzeria captures NIKOLLA inside the Queens Pizzeria speaking with John Doe #1 both before and after the telephone call to SUBJECT TELEPHONE 1. According to John Doe #1, when NIKOLLA came back inside the Queens Pizzeria, he informed John Doe #1 that he would be back in two days and that John Doe #1 should not call him. Video surveillance from the pole camera again captured NIKOLLA leaving the Queens Pizzeria, and moments later, SUBJECT TELEPHONE 1 received another incoming call from the NIKOLLA 917 TELEPHONE. I believe that the NIKOLLA 917 TELEPHONE is being used by NIKOLLA based on the timing of the calls to SUBJECT TELEPHONE 1 immediately following NIKOLLA's conversations with John Doe #1, as well as the fact that the NIKOLLA 917 TELEPHONE was seen on an advertisement for an escort service that I believe, based on my training, experience and participation in the investigation, is operated by NIKOLLA.

58. On September 18, 2013, at approximately 4:19 p.m., NIKOLLA, using SUBJECT TELEPHONE 3 (Session 277), placed an outgoing telephone call to DERVISHAJ on SUBJECT TELEPHONE 1. During the call, NIKOLLA informed DERVISHAJ that he was going to visit John Doe #1 at 8:30 that evening because John Doe #1 had told him "two days." Surveillance of John Doe #1's restaurant revealed that NIKOLLA did not visit John Doe #1 as expected.

59. On September 19, 2013, at approximately 10:21 a.m., NIKOLLA placed an outgoing telephone call on SUBJECT TELEPHONE 3 (Session 1059) to DERVISHAJ on SUBJECT TELEPHONE 1. During the call, the two discussed why NIKOLLA did not visit John Doe #1:

> DN: My battery died, [UI] . . . was there for like an hour. I waited for him like an hour and a half.
>
> [UI]
>
> DN: [UI], Astoria . . . [UI], I'm going tonight . . . I told him 2-3 days . . . do you understand?

RD:   Okay, brother, because you had me worried, fuck his mother.

DN:   I swear my battery died.

RD:   I'm working; I'll talk to you later.

60.    At approximately 3:51 p.m. on September 19, 2013, DERVISHAJ received a call on SUBJECT TELEPHONE 1 from NIKOLLA using SUBJECT TELEPHONE 3.   During that call the following exchange occurred:

DN:   Should I go there sooner?   Should I go around 7 o'clock?

RD:   Go, but call him.

DN:   I don't have his number, don't know if he is there.   I'll call him on the phone.   Whatever you say.

RD:   Come meet me before you, you know.

DN:   Okay.

Based on my training, experience and participation in the investigation, I believe that during this call, NIKOLLA asked DERVISHAJ when he should go to John Doe #1's restaurant, and that DERVISHAJ asked to meet him in person before he collected extortion money from John Doe #1.

61.    Later that evening, at approximately 8:15 p.m., NIKOLLA went to John Doe #1's restaurant to collect the payment.   Video surveillance from the pole camera outside the Queens Pizzeria recorded NIKOLLA entering the Queens Pizzeria.   A review of a consensual recording of the meeting between John Doe #1 and NIKOLLA reveals that, during the meeting, NIKOLLA stated, "give me that money because I don't have too much time.   I have to go."   John Doe #1 then paid NIKOLLA $4,000.[21]

62.    On October 11, 2013, at approximately 6:32 p.m., John Doe #1 called SUBJECT TELEPHONE 2 (Session 4663).   During the call, John Doe #1 inquired about the

---

[21]    The government had previously provided John Doe #1 with the $4,000 payment he made to NIKOLLA.

upcoming extortion payment he owed and indicated that business had been slow. LLAKATURA claimed did not know anything and could not do anything. He further stated that he did not talk over the phone, but indicated he would be in Astoria later with a friend.

63.     On October 15, 2013, at approximately 7:07 p.m., LLAKATURA made an outgoing call using SUBJECT TELEPHONE 2 (Session 5326) to SUBJECT TELEPHONE 1. During the call, DERVISHAJ inquired whether LLAKATURA had spoken with John Doe #1:

RD:     Ha-have you spoken to, to the friend?

BL:     Yes. [pause] Uh?

RD:     So I don't need to, to go and meet him?

BL:     No, no, it is necessary. It is necessary.

RD:     It is necessary?

BL:     Yeah. Wha, what did we agree on, at the beginning! Then...

RD:     Um-hum.

BL:     You know?

RD:     Ha, okay. [pause] Well then.

BL:     Okay? Let me know if [UI].

RD:     Okay. Okay Bye.

BL:     If she, she does not see how – what you are made of—

RD:     [Overlapping conversation] Yeah, yeah.

BL:     -- she [UI] beautifully, understand?

RD:     Uh-huh.

BL:     Okay?

RD:     Okay.

BL:     And then, you know what to do.

RD:     Okay. Okay, then.

41

64.     Based on my training, experience and participation in the investigation, it appears that LLAKATURA advised DERVISHAJ that, while he had already spoken to John Doe #1 (referred to in code as a female on the call), it was still necessary for DERVISHAJ to go see John Doe #1 to send a message to John Doe #1 that full and timely extortion payments must continue to be made.

65.     That same evening, at approximately 8:30 p.m., video surveillance from the pole camera outside the Queens Pizzeria captured DERVISHAJ entering the Queens Pizzeria. While inside the Queens Pizzeria, DERVISHAJ spoke with John Doe #1, which conversation was consensually recorded. According to John Doe #1, during the conversation, DERVISHAJ indicated he was upset with the way John Doe #1 had been acting and, in sum and substance, informed John Doe #1 that he should make the next extortion payment to LLAKATURA.

66.     On or about October 16, 2013, at approximately 8:30 p.m., John Doe #1 met with LLAKATURA in Queens, New York, which meeting was consensually recorded. During the meeting, John Doe #1 provided LLAKATURA with a $4,000 extortion payment.[22]

67.     On November 13, 2013, at approximately 3:55 p.m., LLAKATURA received an incoming call on SUBJECT TELEPHONE 2 from John Doe #1 (Session 9208). During the call, John Doe #1 asked LLAKATURA when he would make the next extortion payment to LLAKATURA, to which LLAKATURA responded, "what's today?   It's early." LLAKATURA then indicated he would call John Doe #1 back.

68.     On November 14, 2013, at approximately 5:06 p.m., LLAKATURA used SUBJECT TELEPHONE 2 to call DERVISHAJ on SUBJECT TELEPHONE 1 (Session 9446). During the call, LLAKATURA informed DERVISHAJ that "your girlfriend called on the phone," referring to John Doe #1. LLAKATURA subsequently informed DERVISHAJ that he would call DERVISHAJ when he arrived in Queens, New York and that he did not

---

[22]     The government provided John Doe #1 with the $4,000 payment before the meeting.

have much time.  LLAKATURA and DERVISHAJ agreed that they would meet with John Doe #1 quickly to collect payment.

69.     At approximately 7:37 p.m. that same evening, LLAKATURA sent a text message to John Doe #1 using SUBJECT TELEPHONE 2 (Session 9471) stating, in Albanian, "Can you meet me in 30 minutes."  At approximately 7:49 p.m., John Doe #1 called LLAKATURA on SUBJECT TELEPHONE 2 (Session 9473)  and the two discussed the timing of their meeting that evening.   Thereafter, at approximately 8:09 p.m. and 8:35 p.m., LLAKATURA placed outgoing calls on SUBJECT TELEPHONE 2 to DERVISHAJ on SUBJECT TELEPHONE 1 (Sessions 9481 and 9507), during which they discussed when and where to meet.  At approximately 8:43 p.m. and 8:53 p.m., LLAKATURA placed outgoing calls on SUBJECT TELEPHONE 2 to John Doe #1 (Sessions 9510 and 9513) informing John Doe #1 of when and where John Doe #1 should meet LLAKATURA.   At approximately 9:16 p.m., LLAKATURA used SUBJECT TELEPHONE 2 to place an ougoing call to DERVISHAJ on SUBJECT TELEPHONE 1 (Session 9520).   During the call, LLAKATURA and DERVISHAJ agreed on a meeting location.

70.     Thereafter, on the evening of November 14, 2013, John Doe #1 met with LLAKATURA and DERVISHAJ in Queens, New York, which meeting was consensually recorded.  During the meeting, John Doe #1 provided DERVISHAJ with a $4,000 extortion payment.[23]

71.     Calls intercepted pursuant to the various court-authorized wiretaps on the SUBJECT TELEPHONES reveal that (1) DERVISHAJ and LLAKATURA regularly discuss criminal activity and where to meet with each other using SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 2; and (2) DERVISHAJ and NIKOLLA regularly discuss criminal activity with each other and where to meet using SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 3.    Interceptions of communications over the SUBJECT

---

[23]     The government provided John Doe #1 with the $4,000 payment before the meeting.

43

TELEPHONES pursuant to court-authorized wiretaps ceased on November 23, 2013. The REQUESTED INFORMATION will constitute evidence of the extortion conspiracy and facilitate physical surveillance of DERVISHAJ, LLAKATURA, and NIKOLLA and the identification of co-conspirators and other victims of the extortion conspiracy.

## AUTHORIZATION REQUEST

72.  WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), it is requested that the Court issue a warrant and Order authorizing agents to obtain the REQUESTED INFORMATION for a period of 30 days. This Court has jurisdiction to issue the requested warrant and Order because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A). Specifically, the Court is "a district court of the United States (including a magistrate judge of such a court) . . . that — has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i)

73.  IT IS FURTHER REQUESTED that the Court direct the Service Providers to assist law enforcement by providing all information, facilities and technical assistance needed to ascertain the REQUESTED INFORMATION, and further direct the Service Providers to initiate a signal to determine the location of the SUBJECT TELEPHONES on the respective service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement officer serving the proposed order, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the users of the SUBJECT TELEPHONES, for a period of 30 days. Reasonable expenses incurred pursuant to this activity will be processed for payment by the FBI.

74.    IT IS FURTHER REQUESTED that the Court authorize execution of the warrants at any time of day or night, owing to the potential need to locate the SUBJECT TELEPHONES outside of daytime hours.

75.    IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrants to delay notice until 30 days after the collection authorized by the warrant has been completed or any extension thereof.   This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.   Providing immediate notice to the subscribers or users of the SUBJECT TELEPHONES would seriously jeopardize the ongoing investigation, as such disclosure would give the targets of the investigation an opportunity to destroy evidence, harm or threaten victims or other witnesses, change patterns of behavior, notify confederates, and flee from and evade prosecution.   Moreover, to the extent that the warrants authorize the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510), or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.

76.    IT IS FURTHER REQUESTED that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application including the application and search warrants.   I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organization, and not all of the targets of this investigation will be searched at this time.   Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums. Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee or

continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

77.   IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. § 2705(b) and for the reasons stated above, it is further requested that the Court issue an Order commanding T-Mobile and Sprint, respectively, not to notify any person (including the subscribers or customers of the accounts listed in the attached warrant) of the existence of the attached warrants until further order of the Court.

Dated: Brooklyn, New York
     November 26, 2013

JOSEPH CHIMIENTI
Task Force Officer
Federal Bureau of Investigation

Sworn to before me this
26 17th day of November, 2013

s/Cheryl L. Pollak

THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

46

## ATTACHMENT A-1

### Property To Be Searched

1.     The cellular telephone assigned call number (571) 337-7018, subscribed to by

REDINEL DERVISHAJ, Dummy, Dummy, No City, New York 11102 ("SUBJECT

TELEPHONE 1"), whose wireless service provider is T-Mobile, a company headquartered at

12920 SE 38th Street, Bellevue, WA 98006.

2.     Information about the location of SUBJECT TELEPHONE 1 that is within the

possession, custody, or control of T-Mobile, including information about the location of the

cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B-1
Particular Things to be Seized

All information about the location of SUBJECT TELEPHONE 1 described in Attachment A-1 for a period of thirty days, during all times of day and night. "Information about the location of SUBJECT TELEPHONE 1" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (*i.e.*, faces of the towers) received a radio signal from the cellular telephone described in Attachment A-1.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of SUBJECT TELEPHONE 1 on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. *See* 18 U.S.C. § 3103a(b)(2).

## ATTACHMENT A-2

### Property To Be Searched

1.      The cellular telephones (1) assigned call number (347) 392-0246, subscribed to by BESNIK LLAKATURA, 186 Jefferson Avenue, Staten Island, New York 10306 ("SUBJECT TELEPHONE 2") and (2) assigned call number (516) 423-1788, subscribed to by DENIS NIKOLLA, 161 Utica Avenue, Apartment 2G, Brooklyn, New York 11213, ("SUBJECT TELEPHONE 3"); both of which have wireless service provider Sprint, a company headquartered at 6200 Sprint Parkway, Overland Park, KS 66251..

2.      Information about the location of SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 that is within the possession, custody, or control of Sprint, including information about the location of the cellular telephones if they are subsequently assigned different call numbers.

**ATTACHMENT B-2**
Particular Things to be Seized

All information about the location of SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 described in Attachment A-2 for a period of thirty days, during all times of day and night.   "Information about the location of SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-2.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government.   In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.   The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure.   *See* 18 U.S.C. § 3103a(b)(2).

F.#2013R00786

# 13 MISC 1 035

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

IN RE APPLICATION OF THE UNITED
STATES OF AMERICA FOR
AUTHORIZATION TO OBTAIN LOCATION
DATA CONCERNING (1) A MOBILE
TELEPHONE ASSIGNED NUMBER (571)
337-7018; (2) A MOBILE TELEPHONE
ASSIGNED CALL NUMBER (347) 392-0246;
AND (3) A MOBILE TELEPHONE
ASSIGNED CALL NUMBER (516) 423-1788

- - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

<u>ORDER</u>

      Application having been made for search warrants under Federal Rule of

Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of

(1) the cellular telephone assigned call number (571) 337-7018, subscribed to by REDINEL

DERVISHAJ, Dummy, Dummy, No City, New York 11102 ("SUBJECT TELEPHONE 1"),

whose wireless telephone service provider is T-Mobile; (2) the cellular telephone assigned call

number (347) 392-0246, subscribed to by BESNIK LLAKATURA, 186 Jefferson Avenue,

Staten Island, New York 10306 ("SUBJECT TELEPHONE 2"), whose wireless service

provider is Sprint; and (3) the cellular telephone assigned call number (516) 423-1788,

subscribed to by DENIS NIKOLLA, 161 Utica Avenue, Apartment 2G, Brooklyn, New York

11213, whose wireless service provider is Sprint ("SUBJECT TELEPHONE 3") (collectively,

the "SUBJECT TELEPHONES"), as further described in Attachments B-1 and B-2 to the

respective search warrants (the "REQUESTED INFORMATION");

      The Court finds that there is probable cause to believe that the REQUESTED

INFORMATION will constitute or lead to evidence of violations of 18 U.S.C. § 1951, as well

as to the identification of individuals who are engaged in the commission of these offenses.

1

The Court also finds that there is reasonable cause to believe that providing immediate

notification of the execution of the warrants may seriously jeopardize an ongoing

investigation, including by giving targets an opportunity to flee or continue flight from

prosecution, destroy or tamper with evidence, change patterns of behavior, or notify

confederates.  *See* 18 U.S.C. §§ 2705(b)(2), 2705(b)(3) and 2705(b)(5).  Furthermore, the

execution of these warrants will not result in the seizure of any tangible property or any wire or

electronic communication (as defined in 18 U.S.C. § 2510).  To the extent that the warrant

authorizes the seizure of any stored wire or electronic information, that seizure is expressly

authorized by 18 U.S.C. § 2703(c)(1)(A).

      IT IS HEREBY ORDERED pursuant to Federal Rule of Criminal Procedure 41

and 18 U.S.C. § 2703(c)(1)(A) that law enforcement officers, beginning at any time within ten

days of the date of this Order and for a period not to exceed 30 days, may obtain the

REQUESTED INFORMATION concerning the SUBJECT TELEPHONES, with said

authority to extend to any time of the day or night as required, including when the SUBJECT

TELEPHONES leave the Eastern District of New York; all of said authority being expressly

limited to ascertaining the physical location of the SUBJECT TELEPHONES and expressly

excluding the contents of any communications conducted by the users of the SUBJECT

TELEPHONES.

      It is further ORDERED that T-Mobile and Sprint (hereinafter, the "service

providers") assist law enforcement by providing all information, facilities and technical

assistance needed to ascertain the REQUESTED INFORMATION, including by initiating a

signal to determine the location of the SUBJECT TELEPHONES on the respective service

provider's network or with such other reference points as may be reasonably available and at

such intervals and times as directed by the law enforcement agent serving the proposed order, and furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as the service provider accords the users of the SUBJECT TELEPHONES.

It is further ORDERED that the Federal Bureau of Investigation compensate the service providers for reasonable expenses incurred in complying with any such request.

It is further ORDERED that the Court's Order and the accompanying Affidavit submitted in support thereof be sealed until further Order of the Court, except that copies of the Court's Order in full or redacted form may be maintained by the United States Attorney's Office, and may be served on law enforcement officers, and other government and contract personnel acting under the supervision of such law enforcement officers, and the service providers as necessary to effectuate the Court's Order.

It is further ORDERED that this warrant be returned to the issuing judicial officer within 14 days after the termination of the monitoring period authorized by the warrant.

It is further ORDERED that, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), service of notice may be delayed for a period of 30 days after the termination of the monitoring period authorized by the warrant or any extension thereof.

It is further ORDERED under 18 U.S.C. § 2705(b) that the service providers shall not disclose the existence of the attached warrants, or this Order of the Court, to the listed subscriber or to any other person, unless and until otherwise authorized to do so by the Court, except that the service providers may disclose the attached warrants to an attorney for the respective service providers for the purpose of receiving legal advice.

3

It is further ORDERED that this Order apply to any changed mobile telephone number subsequently assigned to the SUBJECT TELEPHONES within the period of this Order.

It is further ORDERED that the application and this Order are sealed until otherwise ordered by the Court.

Dated: Brooklyn, New York
November 26, 2013

s/Cheryl L. Pollak

THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

4